**IN THE**
**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**
**NO. 26-3031**

---

| | |
|---|---|
| **MARK LOVELL**<br><br>Plaintiff-Appellee<br><br>**v.**<br><br>**CLERMONT COUNTY, OH SHERIFF'S OFFICE,**<br><br>Defendant<br><br>**JOSEPH BAILEY; ERIC MULLENIX; GREGORY PAFF; DYLAN PEMBERTON; ALEX TINCHER; TERRA SHOUSE, in their official and individual capacities**<br><br>Defendants-Appellants. | On Appeal from:<br><br>United States District Court<br>for the Southern District of Ohio,<br><br>Case No. 1:23-cv-00114<br>Hon. Stephanie K. Bowman |

---

# PLAINTIFF-APPELLEE MARK LOVELL'S BRIEF IN SUPPORT OF DISMISSAL UNDER RULE 27(D) OR, ALTERNATIVELY, SUMMARY AFFIRMANCE OF THE DISTRICT COURT'S DENIAL OF QUALIFIED IMMUNITY

---


James Griffin O'Brien
BEY & ASSOCIATES LLC
428 Ray Norrish Drive
Cincinnati, Ohio 45246

Tel: (513) 506-1515
Email: jim@beyandassociates.com

*Counsel for Plaintiff-Appellee Mark Lovell*

## **Corporate Disclosure Statement**

Pursuant to 6 Cir. R. 26.1, Plaintiff-Appellee[1] Mark Lovell offers the following disclosure:

1. Mr. Lovell is a human being. As such, he is not a subsidiary or affiliate of any publicly traded corporation.
2. Nor does he know of any publicly owned corporation, not a party to this appeal, that has an interest in the outcome.

April 9, 2026

Respectfully Submitted,

*/s/ James G. O'Brien*
James Griffin O'Brien
BEY & ASSOCIATES LLC

*Counsel for Plaintiff-Appellee Mark Lovell*

[1] The Defendant-Appellants misidentify themselves as "Defendants-Appellees" in their "Disclosure of Corporate Affiliations and Financial Interest." (Defendant-Appellants' Corporate Disclosure Statement, Doc. 18, p.i).

## Table of Contents

**Corporate Disclosure Statement** ........ i

**Table of Citations** ........ iv

**Statement in Favor of Summary Disposition** ........ vi

**Summary of the Argument** ........ viii

**I. INTRODUCTION** ........ 1

**II. BACKGROUND** ........ 3

**A. Undisputed Material Facts** ........ 3

**B. The Officers' Version of the Disputed Facts** ........ 6

**C. Mr. Lovell's Version of the Material Disputed Facts** ........ 8

**D. The District Court's Version of the Facts** ........ 29

**III. LEGAL STANDARDS** ........ 30

**A. Summary Judgment** ........ 30

**B. Qualified Immunity** ........ 32

**C. Interlocutory Appellate Jurisdiction** ........ 33

**D. Forfeiture and Waiver** ........ 35

**IV. ARGUMENT** ........ 36

**A. The "Initial Matter" of Mr. Lovell's Still-Image Exhibits** ........ 37

**B. The Defendant Officers Have Forfeited Many of The Arguments They Seek to Raise in This Appeal By Not Making Them Below.** ........ 39

1. The defendant officers' shifting justifications for the takedown maneuver ........ 39
2. The officers' new justifications for Officer Tincher's pepper spray ........ 40
3. The officers' new-found interest in institutional "order" ........ 42
4. The officers' shifting justifications for using any force ........ 43

**C. This Court lacks jurisdiction Over this Interlocutory Appeal. ........................................................................ 48**
1. The defendant officers have not conceded Mr. Lovell's version of the facts. ........................................................................ 48
2. The district court's finding that genuine disputes remain as to whether Mr. Lovell "actively resisted" the officers is not blatantly contradicted by the record. ........................................................ 51
   a. Mr. Lovell's conduct during the nurse's exam. ......................... 51
   b. Whether Mr. Lovell tried to pull away from the officers on the way to the restraint chair. ........................................................ 53
   c. Whether Mr. Lovell actively resisted while on the booking-room floor. ........................................................................ 54
3. Whether Mr. Lovell "charged" Officer Mullenix. ........................... 57
   a. Whether Mr. Lovell "actively resisted" the officers once he was on the shower-room floor. ........................................................ 57
4. This Court lacks jurisdiction over the officers' second assignment of error because it assumes a defendant-favorable resolution of genuinely disputed facts. ........................................................ 59
5. This Court lacks interlocutory jurisdiction to consider whether the district court "failed to properly take into account all facts and circumstances and to consider the totality of the circumstances." ........................................................................ 59

**D. Finally, Albeit Only to the Extent Warranted, the Merits .. 61**
1. The district court did not err in finding that genuine disputes of fact remain as to whether Mr. Lovell "actively resisted" the defendant officers. ........................................................................ 61
2. The district court properly considered all relevant facts, as construed in Mr. Lovell's favor, under the totality of the circumstances. ........................................................................ 65

**V. CONCLUSION ........................................................................ 66**

## Table of Citations

### Cases

*Adams v. Blount Cnty.*, 946 F.3d 940 (6th Cir. 2020) ...................... 23, 45
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ............................ 19
Bailey v. Floyd Cnty. Bd. of Educ., 106 F.3d 135 (6th Cir. 1997) ........... 24
*Barry v. O'Grady*, 895 F.3d 440 (6th Cir. 2018) ................................ 22, 23
*Black v. Carpenter*, 866 F.3d 734 (6th Cir. 2017) ................................... 54
Cunningham v. City of Shelby, Tenn., 994 F.3d 761 (6th Cir. 2021) ..... 26
*Feagin v. Mansfield Police Dept.*, 155 F.4th 595 (6th Cir. 2025) ............ 21
*Gillespie v. Miami Township*, 18 F.4th 909 (6th Cir. 2021) ........... passim
*Groth v. Hill*, No. 25-1053, 2026 WL 674352
(6th Cir. Mar. 10, 2026) ....................................................... 22, 23, 42
Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc., 689 F.3d 793
(6th Cir. 2012) .................................................................... 24
*Heeter v. Bowers*, 99 F.4th 900 (6th Cir. 2024) ....................................... 22
*Howell v. NaphCare, Inc.*, 67 F.4th 302 (6th Cir. 2023) ......................... 19
In re Bayer Healthcare & Merial Ltd. Flea Control Prod. Mktg. &
Sales Pracs. Litig., 752 F.3d 1065 (6th Cir. 2014) ............................... 35
*Jackson v. Ford Motor Co.*, 842 F.3d 902 (6th Cir. 2016) ..... 24, 28, 31, 54
*Jackson-Gibson v. Beasley*, 118 F.4th 848 (6th Cir. 2024) ..................... 23
*Johnson v. Jones*, 515 U.S. 304 (1995) ............................................. 22, 47
Kelly Servs., Inc. v Creative Harbor, LLC, 846 F.3d 857
(6th Cir. 2017) .................................................................... 26
*Kuhn v. Washtenaw Cnty.*, 709 F.3d 612 (6th Cir. 2013) ................. 21, 54
*Miller v. Stovall*, 742 F.3d 642 (6th Cir. 2014) ...................................... 52
*Palma v. Johns*, 27 F.4th 419 (6th Cir. 2022) .................................. 19, 20
*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ........................................ 22, 46
*Rafferty v. Trumbull Cnty.*, 915 F.3d 1087 (6th Cir. 2019) ..................... 19
*Raimey v. City of Niles*, 77 F.4th 441 (6th Cir. 2023) ........................ 23, 46
*Ramsey v. Rivard*, 110 F.4th 860 (6th Cir. 2024) ................. 20, 21, 37, 38
*Robertson v. Lanni*, No. 3:24cv-00919, 2026 WL 607294
(MD. Tenn. Mar. 4, 2026) ..................................................... 51

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................... 20, 21, 23
SEC v. Basic Energy & Affiliated Res., Inc., 273 F.3d 657
(6th Cir. 2001) ........................................................................... 21, 47
*Shumate v. City of Adrian*, 44 F.4th 427 (6th Cir. 2022) ....................... 20
*United States v. Farris*, No. 25-5623, — F.4th— 2026 WL 915082
(6th Cir. Apr. 3, 2026) (per curiam) .................................................. vii

## **Statement in Favor of Summary Disposition**

Pursuant to Fed. R. App. P 34(a) and 6 Cir. R. 34(a), Plaintiff-Appellee Mark Lovell requests that this Court take this interlocutory appeal from the district court's denial of qualified immunity under submission on the written record and briefs. At the outset, the appeal is subject to summary dismissal, under 6 Cir. R. 27(d), as the Defendant-Appellants seek to raise new issues for the first time on appeal, and this Court lacks interlocutory jurisdiction over any lingering issues they might have preserved.

This Court need answer only one question to confirm its lack of interlocutory jurisdiction: whether the district court's version of the underlying events is "blatantly contradicted" by the video evidence in the record. The members of this Court are perfectly capable of viewing the videos for themselves. Holding oral argument simply to afford Appellants yet another opportunity to recite their interpretation of those very same videos would both waste the federal judiciary's already scant resources and further delay this proceeding from moving forward in the district court, where it belongs. *See* Fed. R. Civ. P. 34(A), (C); *United States v. Farris*, No. 25-5623, — F.4th— 2026 WL 915082, at *3 (6th Cir. Apr. 3,

2026) (per curiam) (cautioning members of this Court's bar against acting in a manner that requires the unnecessary use of significant judicial resources or unduly delays resolution of an appeal). Moreover, even if this Court were to excuse Appellants' procedural default and exercise interlocutory jurisdiction it simply does not have, the district court's well-reasoned denial of qualified immunity should be summarily affirmed under this Court's well-established precedents. *See* Fed. R. Civ. P. 34(B).

## I. SUMMARY OF THE ARGUMENT

This Court lacks jurisdiction over this interlocutory appeal from the denial of qualified immunity at summary judgment. Moreover, the Defendant-Appellants seek to raise new issues on appeal that they did not preserve below. As such, the appeal should be dismissed under 6 Cir. R. 27(d). Alternatively, should this Court find interlocutory jurisdiction and excuse the Defendant-Appellants' forfeiture, then the district court's denial of qualified immunity should be summarily affirmed.

## II. INTRODUCTION

In this 42 U.S.C. § 1983 action, Plaintiff-Appellee Mark Lovell alleges that, in the early hours of February 28, 2021, Clermont County sheriff's officers Joseph Bailey, Eric Mullenix, Gregory Paff, Dylan Pemberton, Alex Tincher, and Terra Shouse ("the defendant officers" or "the officers") twice used excessive force against him, in violation of his Fourth Amendment rights, while booking him into the Clermont County Jail.

In the district court, the defendant officers sought summary judgment based on qualified immunity, arguing that none of the force they used against Mr. Lovell was unconstitutional because, in their view,

he "actively resisted" them. (County Defendants' Summary Judgment Motion ("MSJ"), RE 58, PageID #1221-1235; County Defendants' Summary Judgment Reply ("MSJ Reply"), RE 69, PageID #1852-1863). Mr. Lovell opposed the officers' request, insisting he had not "actively resisted" the officers at any point that night. (Plaintiff's Response in Opposition to Summary Judgment ("MSJ Response"). RE 81, PageID #2508-2550).

The district court denied the officers qualified immunity, finding that genuine factual disputes remain as to whether Mr. Lovell "actively resisted" the officers. In turn, the court determined that, no matter how a jury might ultimately resolve those disputes, the amount of force the officers used would necessarily be either unjustified, gratuitous, or grossly disproportionate to the need for force. (Memorandum Opinion & Order of January 2, 2026 ("MSJ Opinion"), RE 85, PageID #3128-3162).

The defendant officers now seek this Court's interlocutory review of the district court's denial of their request for qualified immunity. (Notice of Appeal, RE 86, PageID #3189). In their opening brief, they argue the district court (1) erred "as a matter of law" by finding Mr. Lovell never "actively resisted" them; (2) failed to consider the "legitimate government

interest in maintaining jail security and order"; and (3) failed to "properly take into account all facts and circumstances and to consider the totality of the circumstances." (Appellants' Brief, Doc. 18, p.ii, 12-26).

## III. BACKGROUND

### A. Undisputed Material Facts

The following facts are undisputed. On the evening of February 27, 2021, Mr. Lovell went to a bar and got very, very drunk. (MSJ, RE 58, Page. ID #1224). By 12:30 the next morning, he found himself arrested on two misdemeanor charges – disorderly conduct and resisting arrest. The arresting officer transported Mr. Lovell to the Clermont County Jail, where the defendant officers were waiting for him. So too was another deputy, who had been tasked with recording whatever might transpire during the booking process with a handheld camera. (*Id.*, PageID #1224).

When Mr. Lovell arrived, he was drunk, unsteady on his feet, and slurring his words. But he was compliant. He submitted to an initial pat-down search. He walked voluntarily as the officers escorted him inside the jail, and cooperated with a second search. During the booking process, the officers asked a nurse to check his vitals, given his state of

intoxication. As the nurse placed a pulse oximeter on his right hand, he pulled his right arm away from her. (*Id.*, PageID #1225).

At that point, the officers turned Mr. Lovell around and started walking him toward a restraint chair. As they approached the chair, Corporal Paff initiated a takedown maneuver, causing Mr. Lovell to fall. As Mr. Lovell was face-down on the floor, Officer Tincher sprayed "OC gel" (also known as oleoresin capsicum or pepper spray) in his face. While he remained face down with officers on top of him, the officers used multiple "tactical strikes." Officer Shouse put a spit hood over his head.[2] The officers then strapped him into the restraint chair, rolled the chair into a cell, and left him there for nearly two hours. (*Id.*, PageID #1225-1227).

Later, when the officers removed Mr. Lovell from the cell, he was unresponsive, but Officer Bailey was able to rouse him with sternum rubs. The officers took him to a shower room, where they released him from the restraint chair. Mr. Lovell entered the shower room, and Corporal Paff and Officers Mullenix, Bailey, and Pemberton followed.

---

[2] The district court granted summary judgment on Mr. Lovell's claim that Officer Shouse used excessive force against him during the first incident, and that claim is not at issue in this interlocutory appeal.

The door closed. Officer Shouse waited outside in the hallway, as did the deputy with the handheld camera. (*Id.*, PageID #1231)

Within seconds, a scuffle ensued in the shower room. The deputy with the handheld camera opened the door, and Officer Shouse entered the room. When the door first opened, Mr. Lovell was sitting on a bench with the officers surrounding him. The officers pulled him from the bench, used another takedown maneuver, pepper-sprayed him in the face, and used more “tactical strikes.” They then strapped him back into the restraint chair, took him back to the same cell, and left him there for nearly two more hours. When the officers released Mr. Lovell from the restraint chair a second time, he changed into jail-issued clothing and was placed in another cell. (*Id.*, PageID #1217-1218).

A different nurse saw Mr. Lovell later that morning. She immediately ordered an X-ray, which revealed multiple broken ribs, flail chest, and possible pneumothorax. Mr. Lovell was transported to a local hospital where scans confirmed he had multiple rib fractures and pneumothorax. Given the severity of his injuries, he was transferred to a trauma center, where he was hospitalized for three days. In the end, he was diagnosed with multiple fractured ribs, pneumothorax, lacerated

spleen, hip impingement, and mild cognitive-linguistic deficits resulting from a loss of consciousness. (*Id.*, PageID #1218).

The handheld camera captured it all (except for the eleven seconds of video when the shower-room door was closed), as did several of the jail's security cameras, including Cameras 117, 119, and 169. Each of the defendant officers wrote an unsworn, post-incident statement as part of a "Response-to-Resistance Review" ("RTR"). Def. Ex. 6, RTR Statements, RE 58-7, PageID #1352-1361, 1364).

### B. The Officers' Version of the Disputed Facts

According to the defendant officers, Mr. Lovell "actively resisted" them in the moments leading up to and throughout both incidents. (MSJ, RE 58, PageID #1215-17). In their summary judgment motion, they described him as agitated, argumentative, verbally hostile, noncompliant, belligerent, out of control, aggressive, combative, and violent. (*See generally* MSJ, RE 58, PageID #1211-1270).

According to the officers, Mr. Lovell became "increasingly agitated," "uncooperative," and "aggressive" during the booking process. They claim he pulled his arm away from the nurse "aggressively," then clenched his hand into a fist, and tried to pull away from Officer Bailey. In turn, the

officers told the district court that they were justified in using the takedown maneuver because, as they were walking Mr. Lovell to the restraint chair, he tried to pull away from Corporal Paff and Officer Bailey. (*Id*, PageID #1215-16, 1225, 1227).

The officers also told the district court that they needed to use the pepper spray and "tactical strikes" because, after Mr. Lovell was on the booking room floor, he resisted their efforts to handcuff him. On their telling, as soon as Mr. Lovell landed on the floor, he immediately tucked his right arm under his body, struggled with Officer Bailey as he tried to retrieve it, and refused their orders to give up that arm. (*Id.*, PageID #1227).

According to the officers, it was only then that Officer Tincher deployed the pepper spray, and, in turn, only after the pepper-spray was ineffective, that they "delivered a series of three strategically tactical strikes to [Mr. Lovell's] large muscle groups" (*i.e.*, punched him in the back and legs). And, as the officers would have it, they did not throw a single "tactical strike" once they had control of both of Mr. Lovell's arms. (*Id.*, PageID #1226-1227).

As for the second incident, the defendant officers insist that, after they entered the shower room and the door closed, Mr. Lovell suddenly "jumped up" and "charged" Officer Mullenix. In response to that "active assault," they took him to the floor, where he tucked both of his arms underneath his body, refused their orders to give up his arms, "struggled" with them, "kicked" his legs, and "continue[d] to actively fight" them. (*Id.*, PageID #1232). In short, as the officers' see it, nothing they did during either use of force violated the constitution because the video recordings "clearly show" that Mr. Lovell "actively resisted" them throughout both incidents. (*Id.*, PageID #1223-34).

### C. <u>Mr. Lovell's Version of the Material Disputed Facts</u>

Mr. Lovell does not believe the defendant officers were justified in using any force against him. According to him, he never physically resisted the officers, at any point, before or during either use of force. Notably, in support of his version of the facts, Mr. Lovell provided the district court, as exhibits to his summary judgment response, a complete set of twelve video recordings that were recovered from the jail's cameras. He also submitted—without objection—twenty-two still-images captured from those videos, each time-marked as to the point in each video it

occurred. (Plf. Ex. 1-22, RE 81-3, PageID #2608-2629; *see also* Declaration of Authenticity, RE 81-2, PageID #2600).

Mr. Lovell says he was cooperative, compliant, and non-threatening upon his arrival at the jail and throughout the booking process. He did not physically harm, attempt to harm, threaten to harm, or even act like he was going to harm anyone at the jail. He cooperated during two different searches. He admits, however, that he was quite drunk and a bit obnoxious at times, and the video reflects this. (MSJ Response, RE 81, PageID #2509-2510, 2538, 2541 (citing Plf. Ex. 39 (DeBord Video 1) at 5:23-5:28); Plf. Ex. 24 (Video 2-117) at 4:00-4:45; Plf. Ex. 26 (Video 2-169) at 4:29-4:37)).

As for his version of events leading up to the first use of force, Mr. Lovell substantially complied with the nurse's examination, objecting only to her placing the pulse oximeter on his right hand. This makes eminent sense, as he had been complaining that Officer Bailey's firm grip on his right arm was causing him pain in that arm. Even when he briefly pulled his right hand away from the nurse, he did not do so "aggressively." Plus, the nurse appears unconcerned, expressed no

concern for her safety, and casually put the device on his left hand instead. (*Id.*, PageID #2510-2511).

At this point in the nurse's exam, he tensed his right hand. However, he complied with the officers' directive to relax that hand within just a few seconds and well before the officers took him to the ground. He did not try to pull away from any of the officers during the nurse's exam, when they turned him away from the nurse, or while they were escorting him to the restraint chair. (*Id.*, PageID #2511, 2535-2537).

Mr. Lovell voluntarily walked with the officers toward the restraint chair and was otherwise compliant, non-combative, and non-threatening, when Corporal Paff initiated the takedown maneuver. In support of this contention, Mr. Lovell directed the district court to video recordings from the handheld camera, Camera 119, and Camera 169. He also cited Plaintiff's Exhibit 1, a still-image taken from the Camera 169 footage at **4:44**. It shows him still standing upright, surrounded by five officers, with Corporal Paff and Officer Bailey holding his right arm, when Corporal Paff initiated the takedown maneuver by tripping him with his left foot:



(*Id.*, PageID #2511 (citing Plf. Ex. 1 (Still-image of Video 2-169 (Plf. Ex. 26) at 4:44), DE 81-3, PageID #2608; Plf. Ex. 2 (Still-image of Video 2-169 (Plf. Ex. 26) at 4:48), RE 81-3, PageID #2609; Plf. Ex. 39 (DeBord Video 1) at 5:30-5:33; Video 2-169 (Ex. 26) at 4:44-4:47; Video 2-119 at 4:40-4:50)).

The video evidence shows Mr. Lovell never tucked his arm under his body or otherwise resisted the officers once he was on the booking-area floor, even as Officer Tincher pepper-sprayed him in the face from point-blank range and the officers punched him repeatedly. Rather, he was "pinned to the floor [of a secure facility] in a prone position by five officers, each of whom physically outsized him." (MSJ Response, RE 81, PageID #2512, 2515, 2539-2540, 2548).

To support this assertion, he relies on the video recordings and Plaintiff's Exhibits 3 through 11. Plaintiff's Exhibit 3, a still-image from **Camera 169 at 4:51**, depicts Officer Bailey pinning Mr. Lovell's right arm to the floor, at a 90-degree angle from his body, as he landed on the booking area floor:



(Plf. Ex. 3 (Still-image of Video 2-169 (Ex. 26) at 4:51), RE 81-3, PageID #2610).

Plaintiff's Exhibit 4, an image captured from **Camera 169 at 4:53**, shows Officer Tincher pepper-spraying Mr. Lovell in the face, from point-blank range, **two seconds later**, while Officer Bailey still secured his right arm and the other officers still surrounded him:



(Plf. Ex. 4 (Still-image of Video 2-169 (Ex. 26) at 4:53), RE 81-3, PageID #2611).[3]

Plaintiff's Exhibit 5, taken from the **handheld camera at 5:39**, captures the **exact same moment as Plaintiff's Exhibit 4 (12:31:35)**,

[3] Plaintiff's Exhibit 26 and Defendants' Exhibit 9 are the same video recording from Camera 169, just with different timestamps. To be sure, Plaintiff's Exhibit 4 at 4:53 and Defendants' Exhibit 9 at 12:31:35 capture the same one second in time. (*Compare* Plf. Ex. 4 (still-image of Plaintiff's Ex. 26) *and* Plf. Ex. 26 at 4:53, RE 81-3, PageID #2611 (moment in the Camera 169 footage from which Plf. Ex. 4 was taken), *with* MSJ, RE 58, PageID #1220 (defendant officers' citation to Defendants' Exhibit 9 at 12:31:35) *and* Def. Ex. 9, Video 20210228-RTR-Booking-LovellMark-02, Cler. Co. 266 Camera 169 Booking, at 12:31:35). For this Court's convenience, and in the interest of clarity, in this brief, Mr. Lovell cites to his exhibits and their timestamps, clarifying between the various videos as necessary.

but from a different angle.[4] It too shows Officer Bailey pinning Mr. Lovell's right arm to the floor away from his body, and the other officers surrounding him, when Officer Tincher pepper sprayed him in the face:



(Plf. Ex. 5 (Still-image of DeBord Video 1 (Plf. Ex. 39) at 5:39), RE 81-3, PageID #2612). To be sure, Plaintiff's Exhibits 4 and 5 capture the very same moment in time the defendant officers cited, in their summary judgment motion, as evidence that Officer Tincher pepper-sprayed Mr. Lovell only after "it was clear that [Mr. Lovell] would not comply with

[4] Plaintiff's Exhibit 5 and Defendants' Exhibit 5 are the same video from the handheld camera and have matching time stamps. (*Compare* Plf. Ex. 5 (still-image of Plaintiff's Ex. 39) *and* Plf. Ex. 39 at 5:39, RE 81-3, PageID #2612 (moment in the Camera 169 footage from which Plf. Ex. 5 was taken), *with* MSJ, RE 58, PageID #1220 (defendant officers' citation to Defendants' Exhibit 5 at 5:39) *and* Def. Ex. 5, Video 00012, Cler. Co. 261 at 5:39).

commands to give up his arm that was tucked under his body and continued to actively resist." (*See* MSJ, RE 58, PageID #1226 (emphasis added) *and* Def. Ex. 6 (Officer Bailey's RTR statement), RE 58-7, PageID #1355-1356, *with* Plf. Ex. 39 (DeBord Video 1) at **5:39** *and* Plf. Ex. 26 (Video 2-169) **at 4:53**).

Plaintiff's Exhibit 6, captured by **Camera 169 two seconds later at 4:55**, shows Officer Tincher rubbing the pepper spray into Mr. Lovell's face with his right hand, as Officer Bailey, at this point using both hands, still has Mr. Lovell's right arm pinned to the floor away from his body:



(Plf. Ex. 6 (Still-image of Video 2-169 (Ex. 26) at 4:55), RE 81-3, PageID #2613).

Plaintiff's Exhibit 10, taken from **Camera 169 another three seconds later at 4:58**, portrays Officer Bailey **still** pinning Mr. Lovell's

right arm to the floor, now with his right leg, as he punches Mr. Lovell in the back and Officer Pemberton punches him in the head:



(Plf. Ex. 10 (Still-image of Video 2-169 (Ex. 26) at 4:58), RE 81-3, PageID #2617).

Plaintiff's Exhibit 11, recorded by the **handheld camera** another **five seconds later**, depicts Officer Pemberton preparing to punch Mr. Lovell again even after his face had started bleeding and blood was pooling on the floor:



(Plf. Ex. 11 (Still-image of DeBord Video 1 (Ex. 39) at 5:49), RE 81-3, PageID #2618).

Plaintiff's Exhibits 12 and 13 both show Mr. Lovell, after the officers had strapped into the restraint chair with a bloody spit hood over his head, as the defendant officers placed him in a cell without even wiping any of the pepper spray from his face:




(Plf. Ex. 12 (Still-image of Video 2-169 (Ex. 26) at 7:05), RE 81-3, PageID #2619; Plf. Ex. 13 (Still-image of Video 2-169 (Ex. 26) at 9:10), RE 81-3, PageID #2620).

As for the second incident, other than the defendant officers' unsworn RTR statements, no evidence supports the allegation that Mr. Lovell "lunged" or "charged" at Officer Mullenix in the shower room. And Mr. Lovell has identified multiple facts that tend to refute the officers'

version of the second incident that they wrote in those statements. (*See* Def. Ex. 6, RTR statements, RE 58-7, PageID #1352-1361, 1364).

First, the evidence shows it quite unlikely he was even physically capable of “jumping,” “lunging,” or “charging” anyone, given that—by that point—he was already injured to such a degree he needed substantial assistance from two of the officers to even walk the few steps into the shower room. On this point, he cited footage from two of the cameras and Plaintiff’s Exhibit 14, a still-image from the handheld camera, showing Corporal Paff and Officer Bailey helping him into the shower room after releasing him from the restraint chair:




(MSJ Response, RE, 81, PageID #2519 (citing Plf. Ex. 40 (DeBord Video 2) at 1:32-2:45; Plf. Ex. 30 (Clermont Video 4) at 0:24-1:17; Plf. Ex. 14 (Still-image of DeBord Video 2 (Ex. 40) at 2:19, RE 81-3, PageID #2621)).

Similarly, it curious that the officers did not bother to grab any jail-issued clothing for him to change into once he was inside the shower room, even though they claimed they took him to the room to "decontaminate [him] and provide jail issue clothing." (MSJ, RE 58, PageID #1217, 1231). This is true even though the supply closet was just steps away, across the hall from the shower room. (MSJ Response, RE 81, PageID #2519-2520, 2546-47 (citing Plf. Ex. 40 (DeBord Video 2) at 2:29-2:45; Plf. Ex. 30 (Clermont Video 4) at 1:05-1:42))).

As Mr. Lovell also told the district court, it seems quite conspicuous that no video was recorded of the events that transpired in the shower room during the eleven seconds the door was closed, even though: (1) the deputy with the handheld camera had been given exactly one job, to record everything; (2) that deputy was standing just outside the shower room, camera in hand, recording the closed door the entire eleven seconds; and (3) that deputy did, in fact, record everything else, including Mr. Lovell changing into jail-issued clothing after he was released from the restraint chair a second time.[5] These facts together suggest that, not

[5] Curiously too, the deputy held the shower-room door open, to prevent it from closing, as he recorded Mr. Lovell changing clothes. (Plf. Ex. 41 (DeBord Video 3) at 2:10-7:55).

only were the officers expecting to use additional, gratuitous force once they got him in the shower room, they took him there—under color of law—for the very purpose of doing so, knowing there would be no cameras there to record them. (*Id.,* PageID #2553).

During the eleven seconds that the shower room door was closed and no meaningful visual evidence is available, and while Mr. Lovell was not even capable of "assaulting" Officer Mullenix, he and the officers exchanged words, they surrounded him, and they then started punching him repeatedly even though he was still seated on the bench.

As to this aspect of the second incident, Mr. Lovell directed the district court to Plaintiff's Exhibit 15, which depicts the moment the door to the shower room reopened. Among other things, Mr. Lovell is sitting on a bench surrounded by (right to left) Corporal Paff and Officers Pemberton, Mullenix, and Bailey; Officer Shouse enters the room:



(MSJ Response, RE 81, PageID #2520-2521 (citing Plf. Ex. 15 (Still-image of DeBord Video 2 (Plf. Ex. 40) at 4:04), RE 81-3, PageID #2622)). Mr. Lovell claims that, until this point, he had done nothing more than say a few words before he had to cover his face with his hands to protect himself from the myriad punches the officers started throwing.[6]

Despite having Mr. Lovell surrounded, outsized, outnumbered, and confined to the tiny shower room in a secure area of the jail, the officers nevertheless pulled him off the bench. Plaintiff's Exhibit 16 depicts the moment the officers lifted him from the bench. Officer Pemberton grabs his right arm with both hands (green gloves) and Officer Mullenix grabs

---

[6] The video backs him up on this point too. *See* Plf. Ex. 40 (DeBord Video 2) at 3:07-3:08 (Mr. Lovell mumbles about being very drunk as he stands up and takes off his shirt), 3:33 (Mr. Lovell asks, "Why'd you need ten sheriffs?"), 3:40-3:41 (Mr. Lovell calmly mumbles an expletive), 3:44 (four second later, Officer Mullenix steps toward Mr. Lovell), 3:45-3:46 (Officer Mullenix loudly asks Mr. Lovell, "Why'd they need ten guys?"), 3:46 (Officer Pemberton starts to let the shower-room door close), 3:47-3:50 (Officer Mullenix rocks back and forth on his feet), 3:53 (the shower-room door closes completely), 3:54-3:55 (Mr. Lovell says something about the officers "getting paid"), 3:55-3:56 (one of the officers responded, "That's right, boy!"), 3:57-4:00 (Mr. Lovell says loudly, "Boy? Who the fuck you calling a boy!?), 4:01 (the first punch is audible from the hallway landing on bare skin one second later), 4:04 (only three seconds later the door has reopened and Mr. Lovell is sitting on the bench). Now, as the officers would have it, within a span of four seconds (4:00 to 4:04), Mr. Lovell, who had torn ligaments in his knee and needed help limping into the shower room only seconds earlier, suddenly "jumped" from the bench and lunged at Officer Mullenix, and they were able to react to his unanticipated "active assault," gain physical control of him, place him back on the bench, and then surround him before the door reopened).

his left arm too (black glove on the left), as he continues to try to protect his face with his left hand. Officer Bailey can be seen placing his right arm between Mr. Lovell's legs:



(*Id.*, PageID #2520-2521 (citing Plf. Ex. 40 (DeBord Video 2) at 4:07-08; Plf. Ex. 16 (Still-image of DeBord Video 2 (Plf. Ex. 40) at 4:07), RE 81-3, PageID #2623)).

Without warning, Officer Bailey then lifted Mr. Lovell's body off the ground, raised him several feet into the air, and then dropped him on the floor. Plaintiff's Exhibit 17 depicts Officer Bailey holding Mr. Lovell's body, sideways and several feet off the ground—as he was still trying to protect his face and Officer Pemberton had since grabbed his left arm too:



(*Id.*, PageID #2522 (citing Plf. Ex. 17 (Still-image of DeBord Video 2 (Plf. Ex. 40) at 4:09), RE 81-3, PageID #2624) (yellow circles added for emphasis)).

In the first ten seconds after Mr. Lovell landed on the shower room floor, (1) Officer Pemberton punched him five times and thrust his knee into his shoulder or head at least twice, (2) Officer Mullenix delivered three punches to his torso, (3) Officer Shouse punched him four times in his leg, and (4) Officer Bailey kneed him in his left side at least once. (Plf. Ex. 40 (DeBord Video 2) at 4:10-4:22).

As Mr. Lovell made clear to the district court, after Officer Bailey dropped him to the floor and even as the officers assaulted him, his hands were never underneath his body. Instead, they were shielding the back of his neck, where they were plainly visible to the officers. (*Id.*, PageID #2522-2523). Plaintiff's Exhibit 18 confirms this. It shows Mr. Lovell

lying prone on the floor, as Officer Bailey (middle) secures his left arm with his left hand (black glove), Officer Pemberton holds both of his arms, one with each hand (green gloves), and Officers Shouse and Mullenix are positioned over his lower body. Both of his hands are clearly visible, covering the back of his neck. Nonetheless, Corporal Paff prepares another canister of pepper-spray:



(Plf. Ex. 18 (Still-image of DeBord Video 2 (Plf. Ex. 40) at 4:23).

Corporal Paff then pepper-sprayed Mr. Lovell in the face a second time. Less than three seconds later, the other officers resumed assaulting him, and over the next forty-five seconds: (1) Officer Pemberton punched Mr. Lovell's upper body another ten times; (2) Officer Mullenix punched him in the back six times; (3) Officer Bailey thrust his knee into Mr. Lovell's torso twice more, then sat on his waist and punched him six times in rapid succession; (4) Officer Bailey then climbed off Mr. Lovell so he

could knee him in his upper left leg an additional six times; (5) Officer Shouse punched Mr. Lovell four times in his leg and twisted his legs into unnatural, painful positions; and (6) Corporal Paff joined the fray by punching Mr. Lovell once in his left thigh. (Plf. Ex. 40 (DeBord Video 2) at 4:22-5:07). The officers placed another spit hood over Mr. Lovell's head, strapped him back into the restraint chair, and put him back in the cell alone for another two hours. (*Id.* at 5:23-5:43; Plf. Ex. 30 (Clermont Video 4) at 4:10-4:30).

Mr. Lovell denies having kicked, struggled, or otherwise physically resisted the officers at any time before or during either incident. (*Id.*, PageID #2520, 2524). And, as Mr. Lovell told the district court, over the ensuing minutes and hours, he repeatedly and adamantly denied having done anything to justify either use of force, insisting he had been beaten for no reason at all. Initially, as the officers were strapping him back into the restraint chair, he said, "Yeah, you guys got me." One of the officers responded, "Why'd we need to get you again? All we wanted you to do was change out, to shower." Mr. Lovell replied, "I didn't do nothin'." An officer told him, "We don't do somethin' when you do nothin' bud." (Plf. Ex. 40

(DeBord Video 2) at 6:00-8:10; Plf. Ex. 30 (Clermont Video 4) at 4:30-6:53).

As the officers started to wheel the restraint chair back to the cell, Mr. Lovell mumbled again, "I didn't do nothin'." One of the officers responded, "Why are you making us do this, man?" Mr. Lovell replied, "Ya'll are doin' this." An officer insisted, "No, it was definitely your actions that did this." Mark groaned, "Nooooo." One officer told Mr. Lovell, "All you have to do is comply, do what we tell you to." Another told him to "stop acting ignorant right now." Mr. Lovell passed out and his head fell forward. At this, one of the officers told him, "Take another nap." (Plf. Ex. 40 (DeBord Video 2) at 8:14-8:40).

Nearly two hours later, the officers removed Mr. Lovell from the cell and took him back to the shower room so he could "get that stuff off [his] face and put on some fresh clothes." This time, they grabbed jail-issued clothes, in the correct size nonetheless, for him to change into. (MSJ Response, RE 81, PageID #2524-2525).

When the officers released Mr. Lovell from the restraint chair the second time, his back was visibly red, and he needed significant help to even stand up. Corporal Paff and Officer Pemberton lifted him out of the

chair and then held him up by his arms as he slowly limped into the shower cell, hunched over at the waste:



(Plf. Ex. 37 (Clermont Video 7) at 0:25-1:36; Plf. Ex. 41 (DeBord Video 3) at 0:50-1:49; Plf. Ex. 19 (Still-image of DeBord Video 3 (Plf. Ex. 41) at 1:48), RE 81-3, PageID #2626).

Once Mr. Lovell was back in the shower room, he told the officers that he "wasn't tryin' to be rude to y'all, man." (Plf. Ex. 41 (DeBord Video 3) at 1:50-2:08). He said, "They beat me man, they got me good. I guess this is what they wanted to do." When the officers offered to help him stand up so he could change his pants, he responded, "These mother fuckers beat me up man," and "They got me good." He reiterated that he had not meant to be rude and told the officers, "You didn't have to hit me like that man." (*Id.* at 3:30-6:12). He also removed a dental appliance that had broken sometime earlier, showed the officers his mouth, and told

Officer Pemberton, “They knocked that out.” (Plf. Ex. 41 (DeBord Video 3) at 2:10-2:20, 6:30-7:36). When Mr. Lovell exited the shower room, he required substantial assistance from the officers. He was limping and hunched over. He was unable even to walk the full length of the hallway to be seen by the nurse, who had since returned to the booking area.




Plf. Ex. 20 (Still-image of DeBord Video 3 (Plf. Ex. 41) at 7:48); Plf. Ex. 21 (Still-image of (DeBord Video 3 (Plf. Ex. 41) at 8:01)).

Finally, the officers got Mr. Lovell a wheelchair. When they lowered him into the seat, he told the nurse, “These fools fucked me up bad. He grimaced, held his side, groaned in pain, and exclaimed, “Oh my God!” He then looked at Corporal Paff and twice said, “You beat me man.” (Plf. Ex. 41 (DeBord Video 3) at 9:10-9:44). Corporal Paff did not respond either time.



Plf. Ex. 22 (Still-image of DeBord Video 3 (Plf. Ex. 41) at 9:28).

The officers wheeled Mr. Lovell to a different cell. Once there, he gasped in pain and moaned, "Oh my god!" The officers helped him out of the wheelchair, into the cell, and onto a bed. (Plf. Ex. 38 (Clermont Video 8) at 0:18-0:35); Plf. Ex. 42 (DeBord Video 4) at 0:40-0:45). As they did so, Mr. Lovell again exclaimed, "Oh my god!" and told the officers twice that he was "hurt bad." He asked them, "Why'd they do that man?" and "Why did they do this?" Corporal Paff—who had actively participated in the second incident just a few hours earlier—replied, "Well, apparently you tried to come at 'em." Mr. Lovell insisted he had not. (Plf. Ex. 42 (DeBord Video 4) at 0:45-2:54).

**D. <u>The District Court's Version of the Facts</u>**

The district court largely adopted Mr. Lovell's version of the facts. According to the district court, a reasonable jury could conclude based on

the "video records," that Mr. Lovell "never engaged in physical resistance at any point" during the first incident, that he posed a "virtually non-existent" institutional threat, and that the officers nonetheless used "an overwhelming display of non-lethal force," which caused him significant injuries. (*Id.*, PageID #3156). As to the second incident, the district court found that a reasonable jury could—based on numerous inconsistencies in between their unsworn RTR statements and the video footage together with Mr. Lovell's contemporaneous statements—"conclude that [Mr. Lovell] was physically incapable of charging or assaulting [Officer] Mullenix behind the closed shower door" and that "did not engage in any active resistance or combat thereafter." (*Id.*, PageID #3157-58).

## IV. <u>LEGAL STANDARDS</u>

### A. <u>Summary Judgment</u>

"A court may grant summary judgment only if there is 'no genuine dispute as to any material fact' and the moving party 'is entitled to judgment as a matter of law.'" *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). "Where undisputed facts show that the defendant's conduct did indeed violate clearly established rights, or if there is a factual dispute involving an issue on which the question

of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights, a court must deny summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (cleaned up).

At summary judgment, "[t]he moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1093 (6th Cir. 2019). A genuine dispute of material fact exists, and summary judgment must be denied, so long as "there is sufficient evidence such that a jury could return a verdict for the nonmoving party." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310 (6th Cir. 2023). When considering a motion for summary judgment, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party.[7] *Palma*, 27 F.4th at 427.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes

[7] In their opening brief, the defendant officers misstate this legal standard, asserting that district judges are *prohibited* from drawing *any inferences* at summary judgment, when, in fact, courts are *required* to draw *all reasonable inferences* in favor of the non-moving party.

of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). And when reviewing video of disputed events at summary judgment, a court "must view any relevant gaps or uncertainties left by the videos in the light most favorable to the plaintiff and make all reasonable inferences in their favor." *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022) (cleaned up).

### B. Qualified Immunity

This Court reviews the denial of qualified immunity de novo, applying the same standards as the district court. *Ramsey v. Rivard*, 110 F.4th 860, 865 (6th Cir. 2024). As this Court well knows, to overcome a defendant official's assertion of the affirmative defense of qualified immunity, a plaintiff ultimately bears the burden to establish both parts of a familiar "two-prong" test: (1) that the official violated a constitutional right, and (2) that the right was clearly established when the violation occurred, such that the official had fair notice his or her conduct was unlawful. *Feagin v. Mansfield Police Dept.*, 155 F.4th 595, 603 (6th Cir. 2025).[8] When considering questions of qualified immunity, courts must

[8] The defendant officers have never meaningfully argued the second prong of the test, *i.e.*, whether Mr. Lovell's constitutional right was clearly established as of February 2021, and they do not address it in their opening appellate brief. Accordingly, this

take all facts in the light most favorable to the party claiming a violation of a constitutional right and draw all reasonable inferences in that party's favor. *Scott*, 550 U.S. at 377.

### C. **Interlocutory Appellate Jurisdiction**

This Court has an "independent obligation to police its own jurisdiction." *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 665 (6th Cir. 2001). And, under 28 U.S.C. § 1291, this Court's jurisdiction over interlocutory appeals of district court denials of qualified immunity is limited to reviewing "pure questions of law." *Ramsey*, 110 F.th at 865 (citation omitted); *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *see also Plumhoff v. Rickard*, 572 U.S. 765, 771-72 (2014).

When tasked with resolving a question of qualified immunity at summary judgment, this usually means that a district court must adopt the plaintiff's version of the facts. *Johnson*, 515 U.S. at 378. It also means that, in interlocutory appeals from district court orders denying qualified immunity, this Court "ordinarily accept[s] the plausible facts as stated by the district court and the inferences that it drew." *Groth v. Hill*, No.

---

Court should consider it forfeited. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013).

25-1053, 2026 WL 674352, at *2 (6th Cir. Mar. 10, 2026); *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018). It is for this reason that this Court has "consistently declined to exercise jurisdiction" over interlocutory appeals of qualified-immunity denials "where the officer's dispute of facts is 'crucial to' the appeal." *Id.* (quoting *Heeter v. Bowers*, 99 F.4th 900, 909 (6th Cir. 2024) (collecting cases)).

Even when key facts are genuinely disputed, however, a defendant-official may nevertheless invoke this Court's interlocutory appellate jurisdiction by "conceding the district court's version of the facts, as construed in the light most favorable to the plaintiff," for purposes of the appeal. *Heeter*, 99 F.4th at 909-911; *Adams v. Blount Cnty.*, 946 F.3d 940, 951 (6th Cir. 2020). In that circumstance, the disputed facts are no longer "crucial to" the appeal, and this Court is free to exercise its limited jurisdiction over the "purely legal" question that remains, *i.e.*, whether the official is entitled to qualified immunity under those conceded facts. *Raimey v. City of Niles*, 77 F.4th 441, 448 (6th Cir. 2023); *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018).

Similarly, where "video evidence clearly depicts the critical events and 'blatantly contradicts' the district court's account," this Court views

the facts "as shown by the video." *Groth*, 2026 WL 674352, at *1 (quoting *Jackson-Gibson v. Beasley*, 118 F.4th 848, 851 n.1 (6th Cir. 2024) (citing *Scott*, 550 U.S. at 380-82)). In that scenario, the facts are no longer in "genuine" dispute, leaving only a "purely legal" issue over which this Court has jurisdiction, *i.e.*, whether the facts, as clearly depicted by the video, amount to a violation of a clearly established constitutional right. *Scott*, 550 U.S. at 380; *Jackson-Gibson*, 118 F.4th at 853-54. But the video evidence must unambiguously resolve all factual disputes relevant to the appeal; footage that is obstructed, inconclusive, or incomplete at critical moments simply will not do. *Id.*

### D. <u>Forfeiture and Waiver</u>

Issues and arguments not raised in the district court are forfeited on appeal. *Jackson v. Ford Motor Co.*, 842 F.3d 902, 906 (6th Cir. 2016); *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012). "It is well-settled that this [C]ourt will not consider arguments for the first time on appeal unless [its] failure to consider the issue will result in a plain miscarriage of justice." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997).

## V. ARGUMENT

This Court lacks jurisdiction over this interlocutory appeal because the defendant officers have not accepted the district court's version of a genuinely disputed fact critical to each of their three assignments of error, and the video evidence does not unambiguously resolve those factual disputes in their favor. Instead, in their first assignment of error, the officers continue to argue that they were justified in tackling, pepper-spraying, and repeatedly punching and kneeing Mr. Lovell because he "actively resisted" them, a finding the district court explicitly declined to make because it is belied by the video and other evidence in the record. (*Compare* Appellants' Br. p.4-6, 14, 25-26, 28 *with* MSJ Order, RE 85, PageID #3133-3134, 3157-3158).

In turn, the defendant officers' second and third assignments of error both presume, and depend on, a finding in the officers' favor on those same genuinely disputed facts as to whether Mr. Lovell did, in fact, actively resist them. (Appellants' Br., Doc. 18, p.17-26). The officers also seek to raise issues and arguments they forfeited by failing to raise them below. This Court should thus grant Mr. Lovell's contemporaneously filed

motion to dismiss under 6 Cir. Rul 27(d) (authorizing motions to dismiss for lack of jurisdiction or threshold procedural issues).

Alternatively, should this Court conclude that it has interlocutory jurisdiction over some aspect of this appeal and excuse the officers' forfeiture of multiple key issues, it should nonetheless affirm the district court's well-reasoned analysis as to why the officers are not entitled to qualified immunity on Mr. Lovell's excessive-force claims.

### A. The "Initial Matter" of Mr. Lovell's Still-Image Exhibits

As an "initial matter," the defendant officers make much of the fact that the district court considered the still-image exhibits that Mr. Lovell submitted with his response in opposition to summary judgment. That is, they now claim that the district court relied on the still-images, "rather than the totality of the circumstances," "to represent Lovell's behavior and actions throughout." (Appellants' Brief, Doc. 18, p.12, 20, 23, 28). But the officers did not object to the district court's consideration of the still-images when Mr. Lovell submitted them, together with the complete video recordings, as exhibits below. As such, this issue has been forfeited on appeal. *See Kelly Servs., Inc. v Creative Harbor, LLC*, 846 F.3d 857,

867 (6th Cir. 2017) (party waived right to challenge district court's consideration of certain evidence by not raising the issue below).

Even if this Court were to consider this argument, it fails on the merits. Mr. Lovell is not relying on the still-images to second-guess the officers' reasonable, albeit mistaken, assessment of otherwise innocuous conduct. *See Cunningham v. City of Shelby, Tenn.*, 994 F.3d 761, 767-77 (6th Cir. 2021). Quite the contrary, here the officers have consistently insisted that Mr. Lovel did, <u>in fact</u>, tuck at least one of his arms under his body and resist the officers' efforts to retrieve it during both incidents. The officers have never even suggested they may have been mistaken in that assessment. There is also no indication that the still-images do not accurately represent the underlying events as they transpired. *See id.* (criticizing the district court in that case for using still-images that it admitted did "not tell the full story").

To be sure, this Court has never imposed an absolute ban on the use of still-image exhibits in excessive-force cases, nor could it, at least not consistently with the Federal Rules of Evidence and basic principles of due process. Nothing prevented Mr. Lovell from using true and accurate still-images from the jail's own camera footage to rebut the

officers' gross misrepresentations as to how the underlying events did, in fact, transpire. Moreover, even assuming the district court erred by considering the still-images, any such error was harmless, as it is apparent from the court's opinion that it considered the still-images and their primary-source videos in context, together, and in their entirety. (*See* MSJ Order, RE 85, PageID #3133-3139, 3148-3158).

## B. <u>The Defendant Officers Have Forfeited Many of The Arguments They Seek to Raise in This Appeal By Not Making Them Below.</u>

### 1. The defendant officers' shifting justifications for the takedown maneuver

In their first assignment of error, the officers put forth an entirely new justification for having taking Mr. Lovell to the ground during the first incident. Recall, in their unsworn RTR statements and summary judgment motion, the officers claimed they used the takedown maneuver because Mr. Lovell had tried to pull away from *Corporal Paff and Officer Bailey*, who were on his *right side*, as they approached the restraint chair. (MSJ, RE 58, PageID #1225 ("While transporting him to the restraint chair, [Mr. Lovell] increased his efforts to pull away from Officer Bailey and Cpl. Paff."); *see also* Officer Bailey's RTR Statement, RE 58-7, PageID #1355-1356). Now, in this Court, the officers argue that the take-

down was justified because Mr. Lovell actively resisted *Officers Mullenix and Tincher*, who were on his *left side*, as they approached the restraint chair. (Appellants' Br., Doc. 18, p.13-14). They never made this argument to the district court. As such, it has been forfeited.[9] *See Jackson*, 842 F.3d at 906.

**2. The officers' new justifications for Officer Tincher's pepper spray.**

Similarly, the officers have now taken a different stance as to why Officer Tincher was justified in pepper-spraying Mr. Lovell in the face from point-blank range during the first incident. Recall again, in the district court, the officers claimed the use of pepper spray was objective reasonable because, after Mr. Lovell landed on the booking room floor, he tucked his right arm underneath his body and then struggled with Officer Bailey as he tried to retrieve it:

> When the Officers were able to get [Mr. Lovell] on the ground, he tucked his arm under his body and would not allow them to handcuff him. Once on the ground with his arm tucked under him, the Officers did not immediately begin to deliver strikes but rather worked to get his arm out. <u>When it was clear that [Mr. Lovell] would not comply with commands to give up his arm that was tucked under his body and continued to</u>

[9] As set forth more fully below, this new argument is also belied by the very video evidence on which the officers now purport to rely.

> actively resist, Officer Tincher deployed OC Pepper Spray.

(MSJ, RE 58, PageID #1226-27 (emphasis added) (citing Plf. Ex. 39 (DeBord Video 1) at **5:39)**; Plf. Ex. 26 (Video 2-169) **at 4:53**; Def. Ex. 6 (Officer Bailey's RTR statement), RE 58-7), PageID #1355-1356)). And, in the district court, the defendant officers really went out of their way to hit this point home:

> Mr. Lovell was actively resisting the officers' attempt to handcuff him and was non-compliant with commands to give up his arm. This justified their continued use of force in the forms of strikes and pepper spray in order to gain compliance.
>
> Based on the evidence in the video, the Defendant Officers' use of strikes and pepper spray was objectively reasonable and not excessive because Mr. Lovell was actively resisting and not obeying commands to give up his arm.

(MSJ Reply, RE 69, PageID #1860 (emphasis added) (citing, *inter alia*, MSJ, RE 58, PageID #1223-1230)).

On appeal, however, the officers have now abandoned their theory that, during the first incident, Mr. Lovell tucked his arm under his body as soon as he hit the floor, and before he was pepper-sprayed. Instead, they now offer a new theory—that he pulled his arm away from Officer

Bailey immediately after he had been pepper-sprayed. (Appellants' Br., Doc. 18, p.6). To be sure, they now claim:

> While on the ground, [Mr. Lovell] refused to comply with commands and give up his arms to be handcuffed, at one point wrestling his right arm from [Officer Bailey's] control and tucking it under his body.

(*Id.* (citing Plf. Ex. 26 (Video 2-169) at 4:48-5:08)). To make their new position abundantly clear, they reiterate:

> Camera 169 Booking shows [Officer Bailey] holding [Mr. Lovell's] straight right arm. The footage clearly shows [Mr. Lovell] pull his arm away from the hold and place it under his body. This footage also depicts [Officer Bailey's] repeated attempts to remove [Mr. Lovell's] arm from under [his] body.

(*Id.* p.15 (citing Plf. Ex. 26 (Video 2-169) at 4:55-5:15) (emphasis added).[10]

### 3. The officers' new-found interest in institutional "order"

In their second assignment of error, the defendant officers claim the district court failed to consider the "legitimate interest in maintaining jail security and order" when it assessed the reasonableness of their uses of force. (Appellants' Brief, Doc. 18, p.21-23). The officers did not

[10] Not only is this change in argument forfeited, but it is also an admission that the defendant officers had no objectively reasonable basis for all the violence they inflicted on Mr. Lovell before moving his arm after he was pepper-sprayed.

meaningfully argue this point below, however. Rather, in their summary judgment motion, the officers merely provided boilerplate language for the proposition that uses of force that happen in a jail "pose[] unique issues regarding the need to maintain discipline and order for the safety of staff and inmates alike." By failing to meaningfully address this factor in the district court, the defendant officers have forfeited any argument that the district court failed to adequately consider it. *See Jackson*, 842 F.3d at 906.

#### 4. The officers' shifting justifications for using any force

In their third assignment of error, the defendant officers argue the district court "erred as a matter of law" by "failing to take into account all facts and circumstances and to consider the totality of the circumstances." (Appellants' Br., Doc. 18, p.23-26). More specifically, they contend that the district court evaluated, separately, individual snippets of each use of force, without considering all of Mr. Lovell's conduct, including from the time of his arrest. Their argument grossly mischaracterizes the record.

First, the officers contend that the district court failed to account for how intoxicated Mr. Lovell was that night. Hogwash. To be sure, in its opinion, the district court said:

> In examining the record, the court can consider all events leading up to the use of force. In the case presented, the Defendant Officers were aware that the arresting officer had requested assistance and that Lovell was extremely intoxicated and charged with three misdemeanor offenses . . . . The video record reflects Lovell's slurred speech and unsteady gait.

(MSJ Opinion, RE 85, PageID #3151; *id.*, PageID #3131 (noting that the arresting officer had seen Mr. Lovell "staggering and slurring his speech" and other people "holding him up to keep him from falling"), #3172 (describing Mr. Lovell as clearly intoxicated even after he was released from the restraint chair the second time)).

Next, the defendant officers insist that the district court failed to fully consider their legitimate safety concerns, given that the arresting officer transported Mr. Lovell to the jail "direct." (Appellants' Brief, Doc. 18, p.25). As they did in the district court,[11] the officers have represented to this court that—before or shortly after he arrived at the jail—they were

[11] The district court twice relied on this assertion. (MSJ Order, RE 85, PageID #3151, 3161). This Court should not.

already aware of his charges, including a third misdemeanor violation, as well as threats he had allegedly made to the arresting officer. (*See* Appellants' Brief, Doc 18, p.25; MSJ, RE 58, PageID #1224 (citing Plf.'s Ex. 39 (DeBord Video 1) at 0:24); *id.* PageID #1229; MSJ Reply, RE 69, PageID #1855). This is not true. Upon Mr. Lovell's arrival, Officer Mullenix asked the arresting officer what his charges would be. The officer responded, "Disorderly conduct, resisting arrest *to start*," and told the defendant officers he would need to look at the Ohio Criminal Code before deciding on any additional charges. (Plf. Ex. 39 (DeBord Video 1) at 0:24-0:33). And, for much of the first incident, the arresting officer stood behind the booking counter, consulting a hardcopy of the Ohio Criminal Code as he wrote out his report. (Plf. Ex. 24 (Video 2-117) at 6:05-9:30; Plf. Ex. 26 (Video 2-169) at 1:45-9:58 (same)).

Third, the defendant officers claim that the district court erred by considering only the few seconds immediately preceding Corporal Paff's takedown maneuver when it assessed the reasonableness of the force they used during the first incident. (Appellants' Brief, Doc. 18, p.24). That is simply untrue. In its opinion, the district court made clear it had

considered the totality of events that led up to the takedown, including Mr. Lovell's conduct during the nurse's exam:

> The Officers' decision to escort Plaintiff to the restraint chair is part of the totality of circumstances insofar as it precipitated the first use of force. The Defendant Officers maintain that the threat level increased when [Mr. Lovell] briefly jerked his right hand away as [the nurse] attempted to place a pulse oximeter on [his] right hand. But a reasonable jury could find [Mr. Lovell's] reflexive movement was not threatening given that [he] remained firmly under the control of the Officers at all times, and readily submitted to [the nurse's] placement of the device on his left hand.

(MSJ Opinion, RE 85, PageID #3153); *id.*, PageID #3151, 3161).

And to be sure, the district court had an eminently good reason for focusing on whether Mr. Lovell tried to pull away from the officers just before the takedown – that was the very justification the officers had given for why they felt compelled to even use the maneuver. (*See* MSJ, RE 58, PageID #1216 ("As the Defendant Officers attempted to remove [Mr. Lovell] from [the nurse's] presence to the restraint chair, Mr. Lovell again attempted to pull away from the officers resulting in the officers taking Mr. Lovell to the ground to regain control of him." (citing Plf. Ex. 39 (DeBord Video 1) at 5:31)), *id.* at #1225 ("While transporting [Mr. Lovell] to the restraint chair, [he] increased his efforts to pull away from

Officer Bailey and Cpl. Paff. At this point, [Mr. Lovell] was taken down in a full front fall line takedown maneuver in an attempt to gain control." (citing Plf. Ex. 39 (DeBord Video 1) at 5:24-5:31)); MSJ Reply, RE 69, PageID #1856 ("Mr. Lovell was actively resisting and struggling with the officers as they led him to the restraint chair, which justified the officers' actions in taking [him] to the ground."). In the end, the defendant officers all but concede the futility of this argument, explicitly acknowledging that the district court's opinion "references [Mr. Lovell's] vocal belligerence, the officers' repeated commands to stop clenching his fist, and [his] pulling away from the nurse." (Appellants' Brief, Doc. 18, p.24); *see also In re Bayer Healthcare & Merial Ltd. Flea Control Prod. Mktg. & Sales Pracs. Litig.*, 752 F.3d 1065, 1072 (6th Cir. 2014) ("The doctrine of invited error prevents a party from inducing a court to follow a course of conduct and then, at a later stage of the case, using the error to set aside the immediate consequences of the error." (cleaned up)). This Court should agree.

## C. <u>This Court lacks jurisdiction Over this Interlocutory Appeal.</u>

This Court lacks jurisdiction to review the district court's denial of qualified immunity because the defendant officers have not conceded Mr. Lovell's version of the facts, those facts are not blatantly contradicted by the record, and the officers seek instead only to challenge the sufficiency of the record evidence supporting them.

### 1. The defendant officers have not conceded Mr. Lovell's version of the facts.

Although they purport to have done so, the defendant officers have not actually conceded Mr. Lovell's version of the facts for purposes of this appeal. Despite the district court's clear findings to the contrary, the defendant officers maintain that Mr. Lovell "actively resisted" them by, among other things, expressing "verbal hostilities," "trying to pull away" from them, "refusing their directives to give up his hands," and "physically struggling against their attempts to handcuff him." (Appellants' Brief, Doc. 18, p.13-17).

As to the first incident specifically, they insist that Mr. Lovell was "noncompliant, tense[d] his arm muscles, and tr[ied] to pull away from the officers resulting in the officers taking [him] to the ground to regain

control of him." In turn, they maintain that, once Mr. Lovell was on the floor, he tucked his right arm under his body, justifying their use of pepper spray and "tactical strikes" to "gain control" of him. To be sure, the officers have refused to accept the district court's findings that (1) a genuine dispute of fact remains as to whether Mr. Lovell tried to pull away from them before the takedown maneuver; (2) he landed on the floor facedown, prone, and under the control of five officers; and (3) they had control of both of his arms when Officer Tincher pepper sprayed him. (*Compare* Appellants' Br., Doc. 18, p.5-6 *with* MSJ Order, RE 85, PageID #3134-3135).

In other words, as it relates to the first incident, the defendant officers' first assignment of error is premised entirely on their defendant-friendly versions of key facts that the district court declined to make and that they simply refuse to accept for purposes of this interlocutory appeal. Specifically, it requires two "crucial" assumptions: (1) that Mr. Lovell did, in fact, try to pull away from them before the takedown maneuver, and (2) that he did, in fact, tuck his arm under his body during the first incident. *See Ramsey*, 110 F.4th at 867 (this Court has interlocutory

jurisdiction over the denial of qualified immunity only the extent the defendant-official's factual disputes are not "crucial" to the appeal).

Likewise, when it comes to the second incident, the officers stand steadfast in their view that (1) Mr. Lovell "charged" Officer Mullenix in the shower room; and (2) then "actively resist[ed] by refusing their directives to give up his hands for handcuffing and physically struggling against their attempts to handcuff him." This too directly conflicts with the district court's findings that genuine factual disputes remain as to (1) whether Mr. Lovell was even "physically incapable of charging or assaulting [Officer] Mullenix behind the closed shower door"; and (2) whether he engaged in "any active resistance or combat thereafter." (*Compare* Appellants' Brief, Doc. 18, p.6-7 *with* MSJ Order, RE 85, PageID #3157-58).

The defendant officers have clearly failed to concede Mr. Lovell's version of the facts for purposes of appeal and instead seek to challenge the sufficiency of the evidence supporting the district court's findings. *See Ramsey*, 110 F.4th at 866 (to invoke this Court's interlocutory appellate jurisdiction, the defendant official must concede the plaintiff's version of the facts; it is not enough simply to accept the undisputed facts). As such,

this Court has jurisdiction over this interlocutory appeal only if the district court's findings of genuine factual disputes are "blatantly contradicted" by the video evidence. *See id.*

### 2. The district court's finding that genuine disputes remain as to whether Mr. Lovell "actively resisted" the officers is not blatantly contradicted by the record.

The district court's findings are not blatantly contradicted by the record. In this Court, the defendant officers suggest that, in concluding that genuine disputes of fact preclude a finding that Mr. Lovell actively resisted them during either incident, the district court failed to (1) consider the video recordings from the jail's stationary cameras, which, according to them, clearly show him "actively resisting" them in three ways, and (2) give sufficient deference to their unsworn RTR statements. (Appellants' Brief, Doc. 18, p.13-17).

#### a. Mr. Lovell's conduct during the nurse's exam.

First, the officers contend that the district court failed to consider video footage from Cameras 117 and 169 showing Mr. Lovell "clearly tensing and struggling" with them during the nurse's exam. On this point, the officers slice the bologna far too thin. Mr. Lovell has never disputed that he briefly pulled his arm away from the nurse during her

exam or that he then clenched his right fist for a few seconds. But, as the district court keenly observed, the nurse was entirely unbothered by his movements, and he relaxed his hand within seconds. This is exactly what each of the videos from Cameras 117 and 169 depict. (Plf. 24 (Video 2-117) at 4:15-4:40; Plf. Ex. 25 (Video 2-119) at 4:15-4:40).

And as the district court made clear in its opinion, it recognized that the officers' "decision to escort [Mr. Lovell] to the restraint chair was part of the totality of the circumstances insofar as it precipitated the first use of force." (MSJ Order, RE 85, PageID #3152). More specifically, the district court discussed whether Mr. Lovell's conduct during the nurse's exam, including when he briefly pulled his arm away from the nurse, had even justified taking him to the restraint chair:

> The Defendant Officers maintain that the threat level increased when [Mr. Lovell] briefly jerked his right hand away as [the nurse] attempted to place a pulse oximeter on [his] right hand. <u>But a reasonable jury could find [Mr. Lovell's] reflexive movement was not threatening</u> given that [he] remained firmly under the control of the Officers at all times, and readily submitted to [the nurse's] placement of the device on his left hand.

*Id.*, PageID #3153 (emphasis added). This conclusion is not "blatantly contradicted by the record." Rather, the officers merely disagree with the district court's determination that Mr. Lovell's conduct during the nurse's

exam was too insignificant to justify placing him in the restraint chair. As such, this Court lacks interlocutory jurisdiction to review it. *See Gillespie v. Miami Township*, 18 F.4th 909, 916 (6th Cir. 2021).

**b. Whether Mr. Lovell tried to pull away from the officers on the way to the restraint chair.**

Second, as noted above, the defendant officers now argue that the video recordings from Cameras 119 and 169 show that Mr. Lovell tried to pull away from them, by "shifting his body weight and pulling backwards," just before the takedown maneuver.[12] Not only does the footage from Cameras 119 and 169 not "blatantly contradict" the district court's finding of a material factual dispute, but it also confirms that Mr. Lovell's contention that he did not try to pull away from the officers at all. To be sure, the recordings from Cameras 119 and 169 show that Mr. Lovell's body weight "shift[ed]" and his torso bent "backwards" precisely because Corporal Paff had *already initiated the takedown maneuver by*

[12] The officers' suggestion that the district court may not have considered the footage from these two cameras is disingenuous at best. (*See* MSJ Order, RE 85, PageID #3134 (citing Plf. Ex. 39 (DeBord Video 1) at 5:28-5:35 and Plaintiff's Disputed Issued of Fact 11, RE 81-1, PageID #2578 (citing, *inter alia*, Plf. Ex. 25 (Video 2-119) at 4:40-4:50 and Plf. Ex. 26 (Video 2-169) at 4:44-4:51)).

*tripping him*. (*Compare* Plf. Exhibit 25 (Video 2-119), at 4:38-4:47 (footage from Camera 119 captured between 12:31:20 and 12:31:29), *id.* at 4:45 (showing Mr. Lovell starting to fall **at 12:31:27**), *with* Plf.'s Ex. 26 (County Video 2-169) at 4:44 (video from Camera 169 showing Corporal Paff start the takedown maneuver, *by placing his left foot in front of Mr. Lovell's right foot*, **at 12:31:26**); *see also* Plf. Ex. 40 (DeBord Video 1) at 5:29-5:35 (footage from the handheld camera of Corporal Paff initiating the takedown maneuver, and Mr. Lovell's body shifting to the right before falling to the floor, as a result)). *See Groth,* 2026 WL 674352, at *8 ("Whether a noncompliant suspect was actively resisting turns on whether compliance was feasible from the perspective of a reasonable officer."). Here again, the officers have not identified any record evidence that "blatantly contradicts" the district court's version of the first incident. As such, this Court lacks interlocutory jurisdiction to review whether Mr. Lovell tucked his arm under his body or otherwise resisted the officers' efforts to handcuff him. *See Gillespie*, 18 F.4th at 916.

#### c. Whether Mr. Lovell actively resisted while on the booking-room floor.

Third, despite taking an entirely different approach in the district court, the officers now argue that the footage from Camera 169 depicts

Mr. Lovell actively resisting them by pulling his arm away from Officer Bailey's grip once he while he was on the booking-area floor.[13] More specifically, they now claim that footage shows:

> While on the ground, [Mr. Lovell] refused to comply with commands and give up his arms to be handcuffed, <u>at one point wrestling his right arm from [Officer Bailey's] control</u> and tucking it under his body.
>
> . . .
>
> Camera 169 Booking shows [Officer Bailey] holding [Mr. Lovell's] straight right arm.

(Appellants' Br., Doc. 18, p.6, 15 (emphasis added) (citing Plf. Ex. 26 (Video 2-169) at 4:48-5:08)).

Mr. Lovell does not dispute the officers' new interpretation of the video footage from Camera 169, at least insofar as they concede it "shows [Officer Bailey] holding [his] straight right arm" away from his body, *i.e.*, not under his body, once he was on the booking-area floor. Even so, the

---

[13] Similarly, the officers' insinuation that the district court did not "take into account" this footage from Camera 169 misrepresents the district court's opinion. (MSJ Opinion, RE 85, PageID #3135 (citing Plf. Ex. 6 (Still image of Video 2-169 Plf. Ex. 26) at 4:55), RE 81-3, PageID #2613; and Plaintiff's Response to Finding 54, RE 81-1, PageID #2567 (citing, *inter alia*, Plf. Ex. 26 (Video 2-169) at 4:51-4:54 and Plf. Ex. 3-4, 6, 10 (Still-Images captured from Camera 169 between 4:51 and 4:58, RE 81-3, PageID #2610-2611, 2613, 2617)).

footage does not conclusively show him actively resisting in any way. First, it is unclear whether Mr. Lovell "pulled" his arm from underneath Officer Bailey's leg of his own volition. It is just as, if not more likely that Officer Bailey, who had just been pepper-sprayed himself, released Mr. Lovell's arm by lifting his leg. Also, the video from Camera 169 is, at best, ambiguous as to whether it was Mr. Lovell or Officer Bailey who moved Mr. Lovell's arm toward his lower body.

Either way though, the video from Camera 169 does not blatantly contradict the district court's finding as to whether Mr. Lovell placed his arm underneath his body. In fact, not only could a reasonable jury still conclude that Mr. Lovell never put his arm under his body, but it could also find that either Mr. Lovell or Officer Bailey moved his arm <u>to facilitate the officers' efforts to handcuff him</u>. In other words, the movement of Mr. Lovell's right arm, regardless of who controlled it, after Officer Bailey no longer had it pinned to the floor, is eminently consistent with Mr. Lovell having been <u>fully compliant</u> with the officers' orders to "give them his hands" for handcuffing. (Plf. Ex. 26 (Video 2-169) at 4:58-5:08; Plf. Ex. 39 (DeBord Video 1) at 5:44-5:55). Here, the defendant officers again seek only to dispute factual issues the district court found

to be genuinely disputed, sufficiently supported by the record evidence, and material to the reasonableness of their use of force. *See Adams*, 946 F.3d at 951. Again, this Court lacks interlocutory jurisdiction to consider that argument in this appeal. *See Gillespie*, 18 F.4th at 916.

### 3. Whether Mr. Lovell "charged" Officer Mullenix.

Fourth, as to the second incident, the officers insist that Mr. Lovell has not adduced any evidence to dispute their unsworn RTR statements saying that he "charged" Officer Mullenix in the shower room.[14] In turn, as the officers see it, the district court erred by not treating their statements as "uncontroverted." (Appellants' Brief, Doc. 18, p.17-20). This is exactly the type of sufficiency challenge this Court has consistently found it lacks jurisdiction to consider. *See Gillespie*, 18 F.4th at 916.

#### a. Whether Mr. Lovell "actively resisted" the officers once he was on the shower-room floor.

Also as to the second incident, the defendant officers now contend the district court erred "a matter of law" by considering the footage of the

[14] As discussed below, the officers also conspicuously fail to mention the record evidence on which the district court reasonably relied in finding a genuine dispute of fact on this issue. *See infra*, pg. 51.

second incident as recorded by the handheld camera. According to them, because their bodies obstructed the camera's view of Mr. Lovell's lower body during key moments, the handheld camera footage of the second incident cannot be considered <u>at all</u>, not even to the portion that clearly shows his hands covering the back of his neck. To put it simply, that is not how it works. *See Raimey*, 77 F.4th at 447 (explaining that, when video of an alleged constitutional violation is in the summary judgment record, this Court must view "any relevant gaps or uncertainties" in the light most favorable to the plaintiff).

More importantly, this is precisely the kind of "evidence sufficiency" challenge over which this Court has no jurisdiction in an interlocutory appeal. The officers do not even pretend to be arguing that the handheld camera footage "blatantly contradicts" any of the district court's findings as to whether Mr. Lovell "actively resisted" them in the shower room. Quite the contrary, they question only the relevance and probative value of unquestionably admissible recordings. *See Plumhoff*, 572 U.S. at 772; *Johnson*, 515 U.S. at 313-16. For these reasons, this Court lacks interlocutory jurisdiction to consider the officers' first assignment of error. *See Basic Energy,* 273 F.3d at 665.

#### 4. This Court lacks jurisdiction over the officers' second assignment of error because it assumes a defendant-favorable resolution of genuinely disputed facts.

This Court also lacks jurisdiction over the defendant officers' second assignment of error—that the district court erred "as a matter of law" by not considering the interest in "maintaining jail security and order." According to the officers, the district court failed "to analyze how a reasonable officer on the scene, concerned with maintaining order and security in the jail, would have responded to [Mr. Lovell's] noncompliance with orders, verbal hostilities, and *physical struggles*." They emphasize their "need to ensure order and security in the jail," which they claim, "justified their escalating use of force on a vocally belligerent, non-compliant, and *struggling inmat*e." (Appellants' Brief, Doc. 18. p.23 (emphasis added)). Because this argument relies on the defendant-officers' version of facts that the district court found were in genuine dispute, this Court lacks interlocutory jurisdiction to consider it. *See Gillespie*, 18 F.4th at 916.

#### 5. This Court lacks interlocutory jurisdiction to consider whether the district court "failed to properly take

**into account all facts and circumstances and to consider the totality of the circumstances."**

The defendant officers' third assignment of error is insufficient to invoke this Court's jurisdiction because it relies on the defendant officers' version of genuinely disputed facts. By their own framing, the officers' third assignment of error contests whether the district court fully considered the "totality of the circumstances" in its "ultimate determination" as to whether Mr. Lovell "actively resisted" them before the first use of force. Under any other circumstance, this may sound like a "purely legal issue." But in arguing this point, the officers again rely on their own version of material disputed facts. That is, under their own framing, they claim the district court failed to consider how Mr. Lovell's earlier conduct during the booking process and the nurse's exam might have influenced "whether a reasonable officer at the scene viewed [Mr. Lovell's] *struggles*," immediately before the takedown, to constitute "active resistance." (Appellants' Brief, Doc. 18, p.24 (emphasis added)). As such, this Court lacks interlocutory jurisdiction to consider the officers' third assignment of error. *See Gillespie*, 18 F.4th at 916.

### D. <u>Finally, Albeit Only to the Extent Warranted, the Merits</u>

#### 1. The district court did not err in finding that genuine disputes of fact remain as to whether Mr. Lovell "actively resisted" the defendant officers.

The defendant officers' first assignment of error fails on the merits. Specifically, a reasonable jury could find, as the district court did, that Mr. Lovell never actively resisted the officers, or even if he did, that the amount of force the officers used was grossly disproportionate to the need. As noted above, the officers now contend that none of the force they used during the first incident was excessive because Mr. Lovell (1) tried to pull away from Officers Tincher and Mullenix as they approached the restraint chair, (2) successfully "wrestled" his right arm from Officer Bailey's grip once he was on the floor, (3) <u>then</u> tucked his arm under his body, and (4) struggled with Officer Bailey as he tried to retrieve it. And again, as discussed above, the problem with the officers' new argument is quite simple – it is belied by the very video evidence on which the officers rely. *See supra* p.51.

The officers insist the district court's conclusion that Mr. Lovell did not resist "at any point" during the first incident is necessarily wrong because the district court itself recognized he pulled his arm away from the nurse. But the officers take the district court's statement out of

context. Contrary to the officers' continued insistence that Mr. Lovell "jerked" his arm "aggressively," the district court found, based on the video evidence, that a reasonable jury could conclude this movement was "not threatening." Similarly, the district court found the nurse had already placed her pulse oximeter on Mr. Lovell's left hand by the time the officers started walking him to the restraint chair, and he relaxed his hand after they had taken only a few steps toward the chair. As such, the district court reasonably concluded a jury could conclude that whatever non-compliance or perceived threat Mr. Lovell might have presented during the nurse's exam had already passed, and there was no longer any possible justification for the officers to use force against him at all, let alone by putting him in the restraint chair or taking him to the floor.

The officers also argue the district court erred in finding a genuine dispute as to whether Mr. Lovell pulled away from the officers as they approached the restraint chair because Cameras 117, 119, and 169 show him pulling away from *Officers Tincher and Mullenix*, who were on his *left*. As noted above, on this point, the district court addressed the justification the officers have been giving for the takedown all along—that Mr. Lovell tried to pull away from *Corporal Paff and Officer Bailey*

who were on his *right*. *See supra* p.39. And, as discussed above, this new counternarrative is belied by the video evidence. *See supra id*.

In turn, the officers insist the district court erred "as a matter of law" by not treating their RTR statements as "uncontroverted." This, of course, ignores all the admissible record evidence the district court cited to support its finding of a genuine factual dispute as to whether Mr. Lovell instigated the second use of force. As detailed above, Mr. Lovell pointed the district court to myriad facts that tend to discredit the officers' unsworn statements that he suddenly "jumped up" and "charged" Officer Mullenix in the tiny shower room. *See Robertson v. Lanni*, No. 3:24cv-00919, 2026 WL 607294, at *4 (MD. Tenn. Mar. 4, 2026) (district courts throughout the Sixth Circuit "regularly conclude that, without more, self-serving affidavits are insufficient to sustain a motion for summary judgment" (cleaned up)).

First, as the district court observed, the videos tend to show that Mr. Lovell was already visibly injured before he first entered the shower room. (*See* MSJ Opinion, RE 85, PageID #3158). Next, a reasonable jury could conclude—from the available recordings—that Officer Mullenix instigated the altercation in the shower room. (*See supra* n.6). And, as

Mr. Lovell noted to the district court, after each incident, he repeatedly denied having done anything to justify the officers' use of force against him. (MSJ Opinion, RE 85, PageID #3136-3137, 3157-3158; MSJ Response, RE 81, PageID #2519-2520); *Miller*, 742 F.3d at 649-51 (discussing excited utterances and present sense impressions). Quite frankly, it borders on the absurd to think Mr. Lovell—already injured from the first use-of-force, weighing 155 pounds, and standing 5 feet 5 inches tall—would, or even could, "charge" any of the four officers—each of whom substantially outsized him—that were in the tiny shower room with him. (*See* Mr. Lovell's Arrest Record, RE 58-3, PageID #1301).

The district court properly considered the jail's interest in maintaining institutional order but found it *de minimis*.

In their second assignment of error, the officers contend the district court erred "as a matter of law" by determining "a reasonable jury could conclude the institutional threat in the Jail was virtually non-existent." But the district court *considered and rejected* the officers' contention Mr. Lovell posed any risk to institutional order. As the officers acknowledge, in their opening brief, the district court recognized "the fact that an individual is taken into custody at a jail facility can alter which factors

are considered and what weight they are given." They also recognize the district court found that, here, "a reasonable jury could conclude that the institutional threat in the Jail was virtually non-existent." (Appellants' Brief, Doc. 18, p.21-22).

The officers contend the district court's determination that Mr. Lovell posed no institutional *threat* means it must have considered only their interest in institutional *security* without also considering their interest in maintaining *order*. (*Id.*, p.22-23). Yet the officers have never made any meaningful argument, or pointed to any relevant facts, to suggest that Mr. Lovell's conduct during either incident created any kind of disorder or disruption. They still have not identified any facts to suggest anything Mr. Lovell did created any risk to institutional order at the jail. *See Kuhn,* 709 F.3d at 624; *Jackson*, 842 F.3d at 906. Nor could they, as Mr. Lovell was nowhere near any other arrestee, detainee, or inmate at any time.

**2. The district court properly considered all relevant facts, as construed in Mr. Lovell's favor, under the totality of the circumstances.**

Finally, in their third assignment of error, the defendant officers argue that the district court "failed to properly take into account all facts

and circumstances and to consider the totality of the circumstances." (Appellants' Brief, Doc. 18, p.23-26). More specifically, they allege the district court impermissibly parsed the underlying events into discrete steps and evaluated each step in isolation. As discussed above, this contention is belied by any fair reading of the district court's opinion. *See Black v. Carpenter*, 866 F.3d 734, 741 (6th Cir. 2017).

## VI. CONCLUSION

This Court lacks jurisdiction over this interlocutory appeal. The defendant officers seek only to challenge the district court's finding that a reasonable jury could conclude that Mr. Lovell never offered anything more than passive resistance during either use of force. They have not conceded Mr. Lovell's version of the facts, nor have they shown the district court's findings are blatantly contradicted by the record. Quite the contrary, the officers insist on a counternarrative that Mr. Lovell was "actively resisting" even though the video footage blatantly contradicts <u>their</u> version of the facts. Or as the district court put it, "a picture speaks a thousand words."

Alternatively, should this Court find that it has interlocutory appellate jurisdiction, it should summarily affirm the district court's well-reasoned denial of qualified immunity.

WHEREFORE, Plaintiff-Appellee Mark Lovell respectfully asks that this appeal be dismissed under 6 Cir. R. 27(d), or alternatively, that the district court's denial of qualified immunity be summarily affirmed.

April 9, 2026

Respectfully Submitted,

*/s/ James G. O'Brien*

James Griffin O'Brien (Ohio 0088460)
BEY & ASSOCIATES LLC
428 Ray Norrish Drive
Cincinnati, Ohio 45246
Tel. (513) 506-1515
Email jim@beyandassociates.com

*Counsel for*
*Plaintiff-Appellee Mark Lovell*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of Federal Rule of Appellate Procedure 32(A)(7)(B), because, excluding parts exempted by Fed. R. App. P. 32(f), this document contains **<u>12,979</u>** words.

This document also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

April 9, 2026 Respectfully Submitted,

*<u>/s/ James G. O'Brien</u>*
James Griffin O'Brien
BEY & ASSOCIATES LLC

*Counsel for Plaintiff-Appellee Mark Lovell*

## CERTIFICATE OF SERVICE

I transmitted a true and accurate copy of the foregoing upon:

Brian C. Shrive
CLERMONT COUNTY PROSECUTOR
101 East Main Street, Second Floor
Batavia, Ohio 45103
Phone: 513-732-8178
Fax: 513-732-8171
Email: bshrive@clermontcountyohio.gov

Jeannette E Nichols
CLERMONT COUNTY PROSECUTOR'S OFFICE
101 East Main Street
Batavia, Ohio 45103
Phone: 513-732-7589
Fax: 513-732-8171
Email: jnichols@clermontcountyohio.gov

*Counsel for Defendant-Appellants Joseph Bailey*, *Eric Mullenix*, *Gregory Paff*, *Dylan Pemberton*, *Alex Tincher*, and *Terra Shouse*

Kimberly A Rutowski
HARDIN, LAZARUS & LEWIS, LLC
30 Garfield Place, Suite 915
Cincinnati, Ohio 45202-4322
Phone: 513-721-7300
Fax: 513-721-7008
Email: krutowski@hllmlaw.com

*Counsel for Defendant-Appellants Joseph Bailey*, *Eric Mullenix*, *Gregory Paff*, *Dylan Pemberton*, *Alex Tincher*, and *Terra Shouse*

by filing a copy on the Court's ECF docket on this date.

April 9, 2026

*/s/ James G. O'Brien*
James G. O'Brien (Ohio 0088460)

*Counsel for Plaintiff-Appellee Mark Lovell*

## ADDENDUM

## PLAINTIFF-APPELLEE MARK LOVELL'S DESIGNATION OF THE DISTRICT COURT RECORD

| RE No. | Description | PageID # |
|---|---|---|
| 23 | Operative Amended Complaint | 152-176 |
| 47 | Affidavit of Officer Bailey | 974 |
| 58 | County Defendants' Summary Judgment Motion | 1220 |
| 58-3 | Mr. Lovell's Arrest Record | 1301 |
| 58-7 | County Defendants' Exhibit 6 – "Response to Resistance" Report and Attached Officer Statements | 1347-1371 |
| 69 | County Defendants' Reply in Support of Summary Judgment | 1849 |
| 81 | Plaintiff's Amended Response to County Defendants' Summary Judgment Motion | 2508-2599 |
| 81-1 | Plaintiff's Disputed Issue of Fact 11 | 2567 |
| 81-1 | Plaintiff's Disputed Issue of Fact 54 | 2578 |
| 81-2 | Declaration of Authenticity | 2600 |
| 81-3 | Plaintiff's Exhibits 1 through 22 (still-images) | 2608-2629 |
| 85 | District Court Opinion of January 2, 2026 | 3128-3188 |
| 86 | County Defendants' Notice of Appeal | 3189 |